IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

FILED
U.S. DISTRICT COURT
DISTRICT OF MARYLAND

2014 JUN 27 P 3: 38

CLERK'S OFFICE
AT BALTIMORE

BY: _____ DEPUTY

|   |   |   |
|---|---|---|
| STACEY VENEY *et al.*, | * | |
| **Plaintiffs** | * | |
| v. | * | CIVIL NO.  JKB-13-2410 |
| JOHN W. CLARKE, INC., *et al.*, | * | |
| **Defendants** | * | |

\* \* \* \* \* \* \* \* \* \* \* \*

## MEMORANDUM AND ORDER

### I. Background

Plaintiffs Stacey Veney, Torres Savage, Emory Rhyne, Robert King, and Melvin Brunson filed this suit seeking unpaid wages allegedly due to them under the federal Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201-219, and the Maryland Wage and Hour Law ("MWHL"), Md. Code Ann., Lab. & Empl. §§ 3-401—3-431 (LexisNexis 2008 & Supp. 2013).  Plaintiffs have claimed that Defendants failed to pay them minimum wage for all hours worked and have also claimed entitlement to overtime pay for hours worked in excess of forty hours per week. Plaintiffs were laborers who picked up trash and recyclables and threw them into Defendants' trucks.  Defendants are three trash and recyclables collection companies—John W. Clarke, Inc.; Clarke Refuse Services, Inc.; and Holland Refuse Service, Inc. (collectively, "Clarke Refuse")— and Wesley M. Clarke ("Clarke"), who is an owner and/or manager and operator of all three businesses.  Emory Rhyne accepted Defendants' offer of judgment and is no longer a party to the case. (ECF Nos. 28, 31, 32.)

Pending before the Court is Defendants' motion for partial summary judgment. (ECF No. 25.) Defendants seek judgment in their favor on the two counts for overtime pay, Count III (under the MWHL) and Count IV (under the FLSA). They contend they are exempt from the overtime pay obligations of these two statutes because they are covered by the Motor Carrier Act's ("MCA") exemption as to employees of a motor private carrier for whom the MCA grants jurisdiction to the U.S. Secretary of Transportation to set requirements for qualifications and maximum hours of service when needed to promote safety of operation. *See* 49 U.S.C. § 31502(b)(2). The motion has been briefed (ECF Nos. 26, 30, 33), and no hearing is necessary, Local Rule 105.6 (D. Md. 2011). The motion will be denied.

## *II. Standard for Summary Judgment*

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (citing predecessor to current Rule 56(a)). The burden is on the moving party to demonstrate the absence of any genuine dispute of material fact. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). If sufficient evidence exists for a reasonable jury to render a verdict in favor of the party opposing the motion, then a genuine dispute of material fact is presented and summary judgment should be denied. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). However, the "mere existence of a scintilla of evidence in support of the [opposing party's] position" is insufficient to defeat a motion for summary judgment. *Id.* at 252. The facts themselves, and the inferences to be drawn from the underlying facts, must be viewed in the light most favorable to the opposing party, *Scott v. Harris*, 550 U.S. 372, 378 (2007); *Iko v. Shreve*, 535 F.3d 225, 230 (4th Cir. 2008), who may not rest upon the mere allegations or denials of his pleading but instead must, by

2

affidavit or other evidentiary showing, set out specific facts showing a genuine dispute for trial, Fed. R. Civ. P. 56(c)(1). Supporting and opposing affidavits are to be made on personal knowledge, contain such facts as would be admissible in evidence, and show affirmatively the competence of the affiant to testify to the matters stated in the affidavit. Rule 56(c)(4).

### III. Facts

Defendants admit they have never paid Plaintiffs overtime for hours worked in excess of forty in a workweek. (Defs.' Resp. to Pls.' Request for Admission 9, ECF No. 30-4.) Clarke testified Plaintiffs' work hours in a typical workweek varied "between somewhere in the low 40s to the low 50s." (Clarke Dep. 43:7-8, Feb. 4, 2014, ECF No. 30-6.) Whether Plaintiffs were entitled to overtime pay for their work hours over forty in any given week depends upon the nature of the activities of their employment and certain attributes of Clarke Refuse's business.

As to the basic nature of Plaintiffs' job, King testified in deposition that his job with Clarke Refuse was "[w]orking on the trash truck throwing trash." (King Dep. 6:8-9, Feb. 7, 2014, ECF No. 25-7.) The other Plaintiffs testified similarly: "I was a laborer. I threw trash. I collected trash. I put it on the truck and we either took it to the dump or recycling plant, and that's my job." (Brunson Dep. 5:20—6:1, Feb. 11, 2014, ECF No. 25-8.) "[I m]ainly just walk behind or ran behind the truck and picked up the trash once you seen [sic] it." (Veney Dep. 14:1-2, Feb. 7, 2014, ECF No. 25-9.) "[I d]ump trash. I was a trash man." (Savage Dep. 24:21, Feb. 7, 2014, ECF No. 30-3.) Veney also indicated that he "every now and then pack[ed] the truck up," meaning the trash was compressed so the truck could be filled to capacity. (Veney Dep. 14:3-13.)

Clarke Refuse's foreman, Gordon Seymour, testified that one of the responsibilities of the Plaintiffs is not to pick up hazardous materials, such as ammunition or paint (Seymour Dep.

3

20:15—22:9-11, Feb. 5, 2014, ECF No. 25-4), and King testified that he would not pick up gas cans left out for collection "[b]ecause they probably explode if you impact them" (King Dep. 12:3-20). Veney also testified he knew he was not supposed to take "[s]tuff like liquids, paint cans, [or] certain things" that "[m]ight be harmful to you or it could damage the truck or something like that." (Veney Dep. 16: 8-18.)  Similarly, Savage testified he knew he was not supposed to collect certain things including gas containers because "common sense will tell you that you don't mix gas with stuff that can be flammable or catch a vehicle on fire and have the safety of the driver and the helpers in danger." (Savage Dep. 36:6-18.)

Plaintiffs also testified that they were given additional responsibilities, including lubrication of mechanical parts and changing of tires on the trucks. (King Dep. 29:1-8; Brunson Dep. 10:7, 20-21; Veney Dep. 32:5-9; Savage Dep. 19:1-12.)   Clarke and Seymour acknowledged Plaintiffs were required to perform maintenance on the trucks.   (Clarke Dep. 106:9—108:14; Seymour Dep. 34:20—36:1.)

As to the operation of Clarke Refuse's business, Clarke testified that Defendants pick up residential trash and recycling and commercial trash and recycling. (Clarke Dep. 12:19-20.) Clarke Refuse's largest client is Baltimore County, and the routes were located in "Overly [sic], Parkville, Perry Hall, [and] Towson." (Id. 13:1-2, 14:3.)[1]  Clarke estimated seventy percent of Clarke Refuse's business was with Baltimore County. (Id. 13:3-5.)  As to what Defendants do with what they collect from their Baltimore County routes, Clarke stated, "Take them where Baltimore County tells us to take them." (Id. 16:12-13.)  Seymour testified that the dumping stations were all in Maryland.   (Seymour Dep. 22:21—23:12.)   Recyclables were taken to Cockeysville, Maryland. (Id. 23:13-15.)  Seymour described the process of depositing waste at

---

[1]   The Court takes judicial notice that Overlea, Parkville, Perry Hall, and Towson are all located in Baltimore County, Maryland.

the dumping stations: "You pull in. You back up. Raise your tailgate. Push it off. And go on your merry way. Get your ticket after you pull off the scale." (*Id.* 22:17-20.) He also said dumping recyclables involved the same process as dumping trash. (*Id.* 23:16—24:2.) Clarke indicated that refuse and recyclables from commercial customers were dumped at a place on Quad Avenue (Clarke Dep. 95:7-11, 102:11—103:1), and the Court infers the Quad Avenue facility is in Maryland. Clarke Refuse is paid for the recyclables collected from commercial customers and dumped at this facility. (*Id.* 95:16-17, 96:3-6.)

Clarke stated that refuse and recyclables that have been dumped "are loaded onto tractor trailers, and they're taken basically out of state to different markets." (*Id.* 94:13-15.) When asked how he knew that happened, he said, "Because I was on the waste planning commission as well as the head [*sic*] of Baltimore County, Charles Reighart. . . . He tells me where it goes." (*Id.* 97:3-5, 7.) His last time to attend a meeting of the commission was about five or six years before his deposition was taken. (*Id.* 98:6-9.) When asked why it was of interest to him where the materials went, Clarke replied, "Sometimes I wonder the same thing, but I do find it – personally I find it interesting. Some haulers probably don't care." (*Id.* 101:16-18.) Seymour was also asked how he knew that Baltimore County sends its trash and recyclables out of state, and he replied, "Word of guys and Baltimore County website," but then indicated he does not look at the website. (Seymour Dep. 24:10-19.)

As to whether Defendants' trucks ever traveled out of state for refuse collection, Clarke stated in his answers to interrogatories, "This is a rare occurrence. We did have a customer in Stewartstown, Pennsylvania, Erin Spring, where we picked up on September 14, 2011." (Clarke's Answer to Interrog. 8, undated, ECF No. 30-8.) No other evidence has been found in the record that Clarke Refuse's business involves out-of-state travel. Nor is there any evidence

that Clarke Refuse solicits out-of-state customers or holds itself out as available for interstate cartage. Clarke Refuse's two trucks are registered with the U.S. Department of Transportation ("DOT"); on their biennial report to the DOT, Defendants describe the company operations as "intrastate non-hazmat carrier." (10/13/2012 Motor Carrier Identification Report, ECF No. 25-3.)

## IV. Applicable Statutes

### A. Fair Labor Standards Act

An employee to whom the FLSA's overtime coverage applies and who works more than forty hours in a workweek is entitled to one and one-half times the employee's regular rate of compensation for all hours above forty. 29 U.S.C. § 207(a)(1). Employees to whom this provision of the FLSA applies are those employees who in any workweek are "engaged in commerce or in the production of goods for commerce, or [are] employed in an enterprise engaged in commerce or in the production of goods for commerce." *Id.*

"Commerce" is defined in the FLSA as "trade, commerce, transportation, transmission, or communication among the several States or between any State and any place outside thereof." 29 U.S.C. § 203(b). As relevant to this case, the FLSA also defines an "enterprise engaged in commerce or in the production of goods for commerce" as

> an enterprise that has employees engaged in commerce or in the production of goods for commerce or that has employees handling, selling, or otherwise working on goods or materials that have been moved in or produced for commerce by any person[,] and is an enterprise whose annual gross volume of sales made or business done is not less than $500,000 . . . .

29 U.S.C. § 203(s)(1)(A).

Nevertheless, the mandate of § 207 for payment of overtime does "not apply with respect to any employee with respect to whom the Secretary of Transportation has power to establish

qualifications and maximum hours of service pursuant to the provisions of section 31502 of title 49." 29 U.S.C. § 213(b)(1).

### B. Motor Carrier Act

Pertaining to the instant case, the Secretary of Transportation is granted power to "prescribe requirements for qualifications and maximum hours of service of employees of, and standards of equipment of, a motor private carrier, when needed to promote safety of operation." 49 U.S.C. § 31502(b). That grant of authority applies to transportation described in § 13501 of Title 49. 49 U.S.C. § 31502(a)(1). In turn, § 13501 in relevant part defines the scope of the Secretary's jurisdiction as being "over transportation by motor carrier . . . to the extent that passengers, property, or both, are transported by motor carrier between a place in a State and a place in another State . . . and . . . on a public highway." The term "motor private carrier" is defined as follows:

> a person, other than a motor carrier, transporting property by motor vehicle when-
> (A) the transportation is as provided in section 13501 of this title;
> (B) the person is the owner, lessee, or bailee of the property being transported; and
> (C) the property is being transported for sale, lease, rent, or bailment or to further a commercial enterprise.

49 U.S.C. § 13102(15).

Despite the seeming incongruity between the exclusion of "motor carrier" from § 13102's definition of motor private carrier and the statement in § 13501 of the Secretary's jurisdiction as being over transportation by motor carrier, it is apparently commonly accepted that the Secretary has the power described in § 31502(b) to regulate qualifications and working hours of employees of motor private carriers when needed to promote safety of operation. It seems that § 31502(b)'s reference to § 13501, in conjunction with § 13102(15), is intended to restrict the subject to be regulated to transportation of property in interstate commerce and on public highways. Thus, the

7

effect of the interplay between the FLSA and the MCA as applicable to this case is to exempt from the FLSA's mandatory overtime coverage employees of motor private carriers transporting property in interstate commerce on public highways when the activities of the employees affect safety of operation. *See Troutt v. Stavola Bros., Inc.*, 107 F.3d 1104, 1106 (4th Cir. 1997).

### C. *Maryland Labor & Employment Code*

Maryland's statutory right to overtime compensation is parallel to the same right under the FLSA.   Further, Maryland grants the same exemption as is granted in federal law by the MCA exemption. Md. Code Ann., Lab. & Empl. § 3-415(b)(1), (c)(1) (LexisNexis Supp. 2013). Consequently, if the MCA exemption defeats Plaintiffs' claim under the FLSA, then it will also defeat their state law claim to overtime compensation.

### V. *Analysis*

Defendants admitted in their answer to the complaint that they engaged in interstate commerce and are earning annual revenues in excess of $500,000.   (Defs.' Answer ¶ 16; Compl. ¶ 16.)   Therefore, they fall under the FLSA's overtime mandate unless they can show they are exempt from it.   Exemptions to the FLSA "are to be narrowly construed against the employers seeking to assert them and their application limited to those establishments plainly and unmistakably within their terms and spirit." *Arnold v. Ben Kanowsky, Inc.*, 361 U.S. 388, 392 (1960).

It is well established that loaders of trucks transporting property in interstate commerce fall within the classifications of employees covered by the MCA exemption. *Pyramid Motor Freight Corp. v. Ispass*, 330 U.S. 695, 706-07 (1947); *Troutt*, 107 F.3d at 1108.   But the determination as to whether an individual employee is within the classification of loader is reached through judicial process by evaluating the facts as to the particular activities engaged in

8

by that employee. *Pyramid*, 330 U.S. at 707-08; *Troutt*, 107 F.3d at 1108. "The question of how [Plaintiffs spent their time working for Defendants] is a question of fact. The question whether their particular activities excluded them from the overtime benefits of the FLSA is a question of law . . . ." *Icicle Seafoods, Inc. v. Worthington*, 475 U.S. 709, 714 (1986).

The Court concludes no genuine dispute of material fact exists as to what Plaintiffs' work activities were. The majority of their time, when they were not riding to and from the collection routes, was spent picking up trash and recyclables and throwing them into Clarke Refuse's trucks. But they were expected to use their discretion in deciding what to pick up, and they were also required to perform truck maintenance tasks.

This Court has no difficulty finding from the facts before it that Plaintiffs' activities affect the safety of the operation. Although their "loading" activities are not characterized by the usual discretion as to where and how to stack cargo to assure an even distribution of weight or the responsibility to secure cargo to prevent its shift in transit, Plaintiffs regardless were entrusted with an important responsibility not to pick up items that could be hazardous to the operation of the truck. Even if Plaintiffs exercised this discretion infrequently, it remained an important element in their daily activities since an incorrect decision—for example, taking gas containers and having them compacted into the truck's load—could have significantly disastrous consequences. *See Graham v. Town & Country Disposal of Western Missouri, Inc.*, 865 F. Supp. 2d 952, 960-61 (W.D. Mo. 2011) (finding work of "trash throwers" affected safety of operation where they had judgment and discretion as to avoidance of hazardous items). "[W]here, as here, the employee retains some appreciable discretion in conducting the loading operation in the first instance," the safety of the operation may be affected and the employer may, therefore, be exempt from the FLSA's overtime provisions. *See Blankenship v. Thurston Motor Lines, Inc.*,

415 F.2d 1193, 1197 (4th Cir. 1969). *See also Yellow Transit Freight Lines, Inc.*, 320 F.2d 495, 499 (8th Cir. 1963) ("the District Court is properly directed to the effect of the duties rather than their duration"). In addition, Plaintiffs were required to perform certain maintenance tasks on the trucks, and those tasks plainly affected the safety of the operation. Thus, this element of the exemption is met.

Plaintiffs have not contested whether the trash and recyclables being transported may be considered property. The Court notes this issue was raised in another case, which concluded that such material should be considered property. *Graham*, 865 F. Supp. 2d at 956-59. This Court is not prepared to agree that trash is property. It is true that the material at issue, both trash and recyclables, has some economic value to Defendants because they are being paid to transport it away from customers' property. It is also true that trash may be considered abandoned property, but whether it remains property after it is put out for collection is unclear. However, the Court need not resolve whether trash is property, because it is logical to view the recyclables as property with economic value, and that is sufficient for the purpose of deciding this motion. Defendants are able to sell recyclables collected from their commercial customers, so those items possess intrinsic economic value. And it is reasonable to infer that Baltimore County may have a property interest in recyclables collected by Clarke Refuse and taken to a dump where they may be purchased by others from the County. Consequently, even though Defendants possess the recyclables for only a short amount of time, their transporting them from the point of collection to the point of disposal constitutes the transportation of property on public highways.

Thus, the remaining question is whether Defendants' transportation of property was transportation in interstate commerce. Here is where Defendants' proof fails. At the outset, the Court notes an enterprise's merely being engaged in interstate commerce, as is sufficient to

10

trigger coverage under the FLSA, is insufficient to serve as the basis for the MCA exemption. The latter is premised specifically upon transportation of property in interstate commerce. *Compare* 29 U.S.C. §§ 203(b), (s)(1)(A), 207(a)(1), *with* 49 U.S.C. § 13051.

"The question whether commerce is interstate or intrastate must be determined by the essential character of the commerce . . . ." *Atlantic Coast Line Ry. Co. v. Standard Oil Co. of Kentucky*, 275 U.S. 257, 268 (1927).

> [I]nterstate continuity of transit is to be determined by a consideration of the various factors of the situation. Chief among these are the intention of the owner, the control he retains to change destination, the agency by which the transit is effected, the actual continuity of the transportation, and the occasion or purpose of the interruption.

*Champlain Realty Co. v. Town of Brattleboro*, 260 U.S. 366, 377 (1922), *quoted in Atlantic Coast Line Ry. Co. v. Standard Oil Co. of New Jersey*, 12 F.2d 541, 547 (4th Cir. 1926). "[T]he essential nature of the traffic as a through movement to the point of ultimate destination [may be] shown by the original and persisting intention of the shippers which was carried out." *Baltimore & O.S.W.R. Co. v. Settle*, 260 U.S. 166, 173-74 (1922). "Whether the transportation is of an interstate nature can be 'determined by reference to the intended final destination' of the transportation when that ultimate destination was envisaged at the time the transportation commenced." *Bilyou v. Dutchess Beer Distributors, Inc.*, 300 F.3d 217, 223-24 (2d Cir. 2002) (citations omitted). *See also Burlington Northern, Inc. v. Weyerhaeuser Co.*, 719 F.2d 304, 308 (9th Cir. 1983). Mere contemplation that property may be further shipped from where it was delivered does not amount to an original, persisting intention of a shipper that property is, in fact, to be shipped to another place. *Atlantic Coast Line Ry. v. Standard Oil of N.J.*, 12 F.2d at 545. The "fixed and persisting intent" of the shipper as an essential characteristic of interstate traffic

has been incorporated into opinions of the former Interstate Commerce Commission.[2] *See, e.g.*, *Ass'n of Texas Warehousemen, et al.—Petition for Declaratory Order—Certain For-Hire Motor Carrier Transportation within Texas*, No. MC-C-30194, 8 I.C.C. 2d 476, 481 (May 4, 1992); *Policy Statement—Motor Carrier Interstate Transportation—from Out-of-State through Warehouses to Points in Same State*, Ex Parte No. MC-207, 8 I.C.C. 2d 470, 472 (Apr. 27, 1992).

Defendants' evidence falls far short of establishing their "fixed and persisting intent" that the trash and recyclables they transport to dumping facilities in Maryland are to be delivered to a destination outside the State of Maryland.   For one thing, Defendants rely upon hearsay. Clarke's deposition testimony and affidavit (ECF No. 34-1) on this point are clearly based upon what he has heard from someone else.  Seymour's deposition testimony is the same.  Defendants supply an affidavit from Michael Beichler, Chief of the Bureau of Solid Waste Management for the Baltimore County Department of Public Works, who, on this critical point, simply states,

> We require the contractors, such as John W. Clarke, Inc., to bring the recycling to a landfill or transfer station.  We then weigh the recycling and sell it to various purchasers.  Recyclables and goods made from them are shipped to various points across the country, and even to China.

(Beichler Aff. ¶ 4, Mar. 17, 2014, ECF No. 25-6.)  No detail is provided to allow a conclusion that Clarke Refuse's recyclables are transported out of state.  Even if one could reach that conclusion, one still could not say it is Defendants' "fixed and persisting intent" that the destination for the trash and recyclables they collect shall be outside Maryland.

Clarke professes to be "personally interested" in where trash and recyclables ultimately land, but Defendants make no arrangements for what they dump to be transported out of state. Thus, the determinative facts and circumstances are no different from those found by the

---

[2] The functions of the Interstate Commerce Commission were transferred to the Surface Transportation Board, within the Department of Transportation. *See* 49 U.S.C. § 702.

Supreme Court to be inadequate to establish the requisite, interstate intent of shippers in *Atlantic Coast Line Ry. Co. v. Standard Oil of Ky.*:

> There is nothing to indicate that the destination of the oil is arranged for or fixed in the minds of the sellers beyond [the point to which the sellers have arranged transportation]. . . . Neither the sellers, who deliver the oil, nor the railroad company, that aids the delivery of the oil to the storage tanks and tank cars at the seaboard, has anything to do with determining what the ultimate destination of the oil is, or has any interest in it, or any duty to discharge in respect to it . . . .

275 U.S. at 269. Similarly here, Defendants have nothing "to do with determining what the ultimate destination of the [trash and recyclables] is, or [have] any interest in it, or any duty to discharge in respect to it." Defendants' transportation of property ends at the dump. What happens to the trash and recyclables after that is determined by someone else. That it may wind up outside Maryland is of no moment to Defendants. *See also Burlington Northern*, 719 F.2d at 307-08 (defendant failed to produce evidence it had fixed and specific intent to ship logs out of state); *Alice v. GCS, Inc.*, Civ. No. 05-50132, 2006 WL 2644958, at *4 (N.D. Ill. Sept. 14, 2006) (waste collection company's delivery of material to in-state recycling center marked end of intrastate journey; defendant's "fixed and persistent intent was to unload its debris at Heartland [recycling center]" and defendant did not maintain interest in materials once deposited there).

The cases cited by Defendants on this issue are factually distinguishable from the instant case. In *Craft v. Ray's, LLC*, Civ. No. RLY-JMS-08-627, 2009 WL 3163148 (S.D. Ind. Sept. 29, 2009), *amended on state law grounds*, 2010 WL 148306 (Jan. 13, 2010), the defendant was a recycling and waste disposal company that sold over half of its recyclables to out-of-state recipients. Defendants here do not contract with any out-of-state entities for the purchase of their recyclables. Any recyclables they sell are sold to a Maryland entity, the Quad Avenue facility, and Defendants take no part in the buyer's decision as to what happens to the recyclables after that. In *Brennan v. Schwerman Trucking Co. of Virginia, Inc.*, 540 F.2d 1200 (4th Cir. 1976),

13

the lack of interstate transportation was not determinative in light of the facts that the defendant held itself out to the public as available for interstate cartage and solicited interstate business. *Id.* at 1203-04. Neither of those factors is present in this case.

Defendants have also suggested that the *Graham* decision is similar factually, but overlook that the waste collection company in that case had routes in both Kansas and Missouri and its trucks regularly traveled the highways back and forth across the state line to meet its contractual obligations. 865 F. Supp.2d at 953. In *Walters v. American Coach Lines of Miami, Inc.*, 575 F.3d 1221 (11th Cir. 2013), the Eleventh Circuit rightly concluded that the defendant, which shuttled cruise ship passengers between airports, hotels, and ships, transported passengers in "a practical continuity of movement" in interstate and international travel. *Id.* at 1230. In contrast, Clarke Refuse's transportation of waste and recyclables ends where they are dumped in Maryland. It is immaterial to Clarke Refuse if the waste and recyclables stay in Maryland or leave the State, and Defendants do not undertake their transportation with the intention to begin an interstate journey of the materials. Another case relied upon by Defendants is *Rodriguez v. Pan & Plus Baking, LLC*, Civ. No. 12-23193, 2013 WL 1681839 (S.D. Fla. Apr. 17, 2013), but that case is also factually dissimilar from the one before the Court. The *Rodriguez* defendants purchased baked goods from outside Florida and sold them to Florida retailers, with the goods making a stop in between at the defendants' warehouse. Finding that the defendants' fixed and persistent intent was obvious, *i.e.*, to ship goods in interstate commerce, the Court found the MCA exemption applicable to the in-state driver plaintiffs' FLSA overtime claims. *Id.* at *5. Defendants here stand on much different ground. As was true in the *Alice* case, Defendants' fixed and persistent intent was to take the waste and recyclables no farther than where they were to dump them—in the State of Maryland.

Lastly, Defendants cite *Talton v. I.H. Caffey Distributing Co., Inc.*, 124 F. App'x 760 (4th Cir. 2005) (unpublished).  There, the defendant was a wholesaler and distributor of beer and wine, a substantial portion of which was produced outside of North Carolina where the plaintiff was a driver and sales representative responsible for, among other things, delivering product to retail establishments in North Carolina.  The plaintiff claimed the product's delivery to defendant's warehouse from which the intrastate routes were run resulted in an interruption of the product's interstate journey.  The Fourth Circuit concluded the defendant's ordering product from outside North Carolina was in anticipation of its in-state customers' needs and that was sufficient to maintain the interstate character of the transportation.  *Id.* at 765.  Defendants cited one other case relating to the issue of interstate transportation, but it did not deal with the difference between interstate and intrastate transportation and, therefore, is not of any assistance in resolving this case.  *See Richardson v. James Gibbons Co.*, 132 F.2d 627 (4th Cir. 1942), *aff'd sub nom. Southland Gasoline Co. v. Bayley*, 319 U.S. 44 (1943).  Defendants have failed to show their transportation of property was in interstate commerce.

## VI. Conclusion

The Court concludes that Defendants are not entitled to the MCA exemption to the FLSA's overtime provisions or their Maryland statutory counterpart.  Accordingly, Defendants' motion for partial summary judgment (ECF No. 25) is DENIED.

DATED this **2 7** day of June, 2014.

BY THE COURT:

James K. Bredar
United States District Judge

15